322

ALASKA AIRLINES, INC., Plaintiff,

v.

NORTHWEST AIRLINES, INC.,
Defendant.

Civ. No. J-7-63.

United States District Court
D. Alaska,
at Juneau.

April 14, 1964.

James B. Bradley, Robert J. Annis and James D. Nordale, Robertson, Monagle, Eastaugh & Annis, Juneau, Alaska, Joseph H. Shortell, Jr., Seattle, Wash., for plaintiff.

Robert Boochever and Avrum M. Gross, Faulkner, Banfield, Boochever & Doogan, Juneau, Alaska, for defendant.

PLUMMER, District Judge.

By this action the parties seek a declaration of their rights arising out of an agreement relating to the use of an airport and related facilities at Shemya, Alaska.

In September of 1955 the United States of America was the owner and had jurisdiction over the Island of Shemya. The air navigation facility located there was administered by the Administrator of Civil Aeronautics Ad-

ministration under the provisions of the International Aviation Facilities Act (62 Stat. 450, 49 U.S.C.A. § 1151 et seq., Act of June 16, 1948, c. 473). 49 U.S.C.A. § 1159 provides, in part, as follows:

"(a) With regard to airport property and airway property in territory (including Alaska) outside the continental limits of the United States which he has acquired pursuant to this chapter or any other provision of law, the Administrator is empowered and directed to do and perform, by contract or otherwise, all acts and things necessary or incident to their consolidation, operation, protection, maintenance, improvement, and administration, including but not limited to the power * * *. (3) to lease under such conditions as he may deem proper and for such periods as may be desirable (not to exceed twenty years) space or property for purposes essential or appropriate to their consolidation, operation, protection, and administration under this chapter; * * *."

On September 30, 1955, defendant leased the Shemya airfield from the United States of America, the United States being represented by the Administrator of Civil Aeronautics Administration. The lease contained, among others, the following provisions:

"WHEREAS, it is considered to be in the public interest that said air navigation facilities at Shemya be available to the aeronautical public on a non-discriminatory basis:" and

"(c) Lessee shall maintain and operate as complete an air navigation facility at Shemya as is practicable including, but not limited to: landing areas, communications and navigation facilities, to be available to any civil or military aircraft of the United States or friendly foreign registry or ownership on a non-discriminatory basis.

"(d) Lessee shall furnish all available services at Shemya to the aeronautical public at fair and reasonable prices and shall, as soon as practicable hereafter and in any event within six months from the date hereof, furnish Lessor with a schedule of charges to be made for such services by Lessee at Shemya, which schedule of charges shall be approved by the Administrator of Civil Aeronautics or his designee unless found by him or his designee to be excessive, discriminatory, or unfair, in which case Lessee agrees to amend said schedule of charges to conform to those considered, in the judgment of Lessor, to be reasonable."

On January 5, 1959, an agreement pertaining to Alaska's use of the Shemya facilities was entered into between Northwest and Alaska. It provided, in part, as follows:

"4. Alaska agrees to hold harmless and indemnify Northwest, its officers, agents, contractors, servants and employees from all claims and liabilities for damage to, loss of, or destruction of any property of Alaska, its officers, agents, servants and employees, and the property of any other person or persons, and for injuries to or death of any person or persons which may now or hereafter arise out of or be in any way connected with the service and facilities furnished to Alaska under this agreement."

By reference, a schedule of charges for Shemya airport dated May 10, 1957, submitted to CAA by Northwest Airlines and approved by the Acting Administrator of the CAA on July 12, 1957, was made a part of the agreement between Northwest and Alaska. This schedule of charges provided, in part, as follows:

"J. Shemya and its facilities shall be listed in all publications as privately operated and available to the aeronautical public upon the

terms and conditions set forth herein and at the sole risk of the user, and the user will specifically indemnify and hold Northwest Airlines, Inc., its employees, agents, contractors and subcontractors, harmless against any and all claims for loss, damage, injury or death arising out of or in any way connected with such use of the facilities or services provided at Shemya."

On July 21, 1961, while Northwest was operating the Shemya airfield under the terms of its lease agreement with the United States of America, a DC6 airplane owned by Alaska and operated by it as Flight 779, crashed and burned near the approach end of Runway 10 at Shemya. All six crew members aboard the aircraft were killed and the aircraft was destroyed or substantially damaged.

In a separate action pending in this court (No. J–4–63 Civil), Alaska has sued Northwest alleging that its negligence was the sole and proximate cause of the accident and seeking to recover for the loss of the aircraft and attendant damages. Northwest has denied Alaska's allegations of negligence and has, in turn, alleged contributory negligence and assumption of risk on the part of Alaska. As a further affirmative defense, Northwest claims the protection of the exculpatory provisions contained in the agreement of January 5, 1959.

Six wrongful death actions have been instituted against Northwest in other courts by personal representatives of the deceased crew members. Northwest has demanded that Alaska defend those cases, basing this claim upon the exculpatory provisions of the agreement.

The combined total recovery sought by these actions approximates $3,000,000.-00. This action was brought for the purpose of obtaining a declaration of the rights existing between Alaska and Northwest under the exculpatory provisions of the agreement of January 5, 1959.

This court has jurisdiction under 28 U.S.C.A. § 1332(a) and under the declaratory judgment provisions contained in 28 U.S.C.A. §§ 2201 and 2202.

The parties are in complete agreement that the exculpatory provisions contained in the agreement of January 5, 1959, are clear and unequivocal. Alaska vigorously contends that the contract clearly did not provide that Northwest would be indemnified against its own negligence. Defendant with equal vigor contends just the opposite. Provisions similar to those involved in the present case were contained in agreements which Northwest had with Scandinavian Airlines System, Inc., and Japan Airlines Company, and were construed by them to include damage to, loss of, or destruction of property and injury to or death of persons caused by the gross negligence or willful misconduct of Northwest Airlines.

In United States v. Wallace, 18 F.2d 20, 21 (9th Cir. 1927), the court, with reference to an indemnity provision there being considered, stated as follows:

"Read literally, the language is undoubtedly broad enough to cover not only cases where both indemnitor and indemnitee are negligent, but cases where, as here, the indemnitee alone is chargeable. But in the light of the circumstances and of established principles of interpretation, should it be so understood? * * *"

In American Stevedores v. Porello, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011 (1947), the court in holding an indemnity provision to be ambiguous stated:

"It may be that the parties only meant American to indemnify the United States should the Government be held liable for damages solely caused by American's negligence. It may be that the intention was that American should fully reimburse the United States for all damages caused in any part by American's negligence. Finally, the parties may have intended that

American, in case of the joint negligence of the parties, should be responsible for that proportion of the damages which its fault bore to the total fault."

The similarity of the provisions presently under consideration with those considered in Wallace and Porello is sufficient to raise a serious question as to whether they can be said to be expressed in clear and unequivocal terms.

A contract of indemnity will not be construed to indemnify a person against his own negligence unless such intention is expressed in "clear and unequivocal terms". An examination of the reported cases readily establishes that the words "clear and unequivocal terms" can be interpreted in more than one manner.

The letter agreement between the parties dated December 19, 1958, was addressed to Alaska Airlines, Inc., 435 Fourth Avenue, Anchorage, Alaska, to the attention of Mr. Kelley Weiss, Assistant Vice President—Operations, and accepted by him on behalf of Alaska on January 5, 1959. The place of contracting is the place where the last event necessary to make the contract occurs. Consequently, the construction and validity of the present contract is to be determined according to the law of Alaska. Since the letter agreement was drafted and prepared by Northwest any question of doubt in its interpretation should be construed against Northwest.

The Supreme Court of Alaska has not as yet passed upon the issues presented by this case. Under these circumstances this court is required to use its best judgment in predicting what the State court would hold. Tavernier v. Weyerhaeuser Company, 309 F.2d 87, 91 A.L.R. 2d 1268 (9th Cir. 1962).

Plaintiff suggests that the opinion of the United States Court of Appeals for the Ninth Circuit in United States v. Wallace, supra, should be controlling since it was determinative of the law in Alaska prior to statehood and no Alaskan court has since spoken on the subject. In Wallace the court was required to construe an indemnifying provision which provided:

"The contractor is to fully protect the ship and owners against any and all claims for injury to workmen engaged by him or his subcontractor, in carrying out work on the vessel."

In holding that this clause did not indemnify the owner, the United States of America, against its own negligence, the court stated, in part, as follows:

"The established principle is thought to be that general words alone do not necessarily import an intent to hold an indemnitor liable to an indemnitee for damages resulting from the sole negligence of the latter; it is but reasonable to require that an obligation so extraordinary and harsh should be expressed in clear and unequivocal terms."

Defendant responds to this suggestion by asserting that although Wallace may be distinguished from the present case purely on the language of the clause, the actual ground of distinction is much broader, and that while Wallace may have represented a view prevalent in the Ninth Circuit 35 years ago, the case has never been cited by that court since and its reasoning has been completely rejected.

In Southern Pac. Co. v. Layman, 173 Or. 275, 145 P.2d 295 (1944), the Supreme Court of Oregon construed an indemnity provision which provided:

"Licensee shall and hereby expressly agrees to indemnify and save harmless the Licensor and its lessor from and against any and all loss, damage, injury, cost and expense of every kind and nature, from any cause whatsoever, resulting directly or indirectly from the maintenance, presence or use of said crossing."

In holding that the provision did not cover losses caused by the indemnitee's negligence, the Supreme Court of Oregon quoted extensively from Wallace and cited and relied upon all of the cases

cited by the Ninth Circuit Court of Appeals in its opinion in Wallace.

However, defendant states that the Supreme Court of Oregon in Southern Pacific Co. v. Morrison-Knudsen Co., 216 Or. 398, 338 P.2d 665 (1959), has restricted Layman to its facts and arrived at a completely different result on similar language.

In Boise Cascade Corp. v. Nicholson Manufacturing Co., 221 F.Supp. 135 (D.C.Or.1962), the court adhered to the rule laid down by the Supreme Court of Oregon in Layman and clearly distinguished the holding in Morrison-Knudsen.

The decision of the district court was affirmed in a per curiam opinion, Boise Cascade Corp. v. Nicholson Manufacturing Co., 322 F.2d 792 (9th Cir. 1963), which states as follows:

"We refer to and adopt the opinion of the District Court appearing at 221 F.Supp. 135 and affirm the judgment for the reasons therein stated."

Layman embodies the rationale of Wallace. The rationale of Layman is clearly adopted by the United States District Court of Oregon in Nicholson Manufacturing Co. On appeal the United States Circuit Court of Appeals, in the clearest of language, adopts the logic and reasoning of Wallace and Layman.

■ Wallace is probably the leading case, and has been cited with approval on numerous occasions, for the proposition that to impose liability upon an indemnitor for the negligence of the indemnitee, the intention of the parties must be expressed in clear and unequivocal terms.

As previously stated, the Supreme Court for the State of Alaska has not had occasion to decide the precise question here presented. Plaintiff's suggestion that the Ninth Circuit's opinion in the Wallace case should be controlling on this court is entitled to serious consideration.

The Act of May 17, 1884, c. 53, sec. 7, 23 Stat. 24, 25–26, an act providing a civil government for the Territory of Alaska, provided, in part, as follows:

"Sec. 7. That the general laws of the State of Oregon now in force are hereby declared to be the law in said district, so far as the same may be applicable and not in conflict with the provisions of this act or the laws of the United States * * *."

Historically the courts of the Territory of Alaska considered the opinions of the Supreme Court of Oregon as being highly persuasive. There has been no indication to date that the Supreme Court of the State of Alaska will deviate from or abandon this practice. Under the circumstances of the present case, this court believes that the Supreme Court of Alaska, if faced with this question, would quite properly follow the logic and reasoning of the decisions in Wallace, Layman and Nicholson Manufacturing Co.

■ The construction to be given the exculpatory provisions under consideration in this case can best be stated by paraphrasing the conclusion of the District Court of Oregon in Nicholson Manufacturing Co. as follows: Whatever else the general promise of indemnity may include, the rule in Wallace, Layman and Nicholson Manufacturing Co. prohibits this court from reading into it an intent to indemnify for losses caused by the sole negligence of the indemnitee. If, in this case, Northwest had wished to make Alaska an insurer not only for losses caused by Alaska's acts, but also for losses caused by Northwest's sole negligence, that intention should have been expressed in clear and unequivocal language. The language here falls short of this requirement.

Alaska also contends that this case falls squarely within the facts and logic of Air Transport Associates, Inc. v. United States, 221 F.2d 467 (9th Cir. 1955). Northwest, however, states that Air Transport is not applicable since

Shemya airport was not being operated by it as a public facility.

49 U.S.C.A. § 1349 (sec. 303 of the Civil Aeronautics Act of 1938, 52 Stat. 973, 986) provides that there shall be no exclusive right for the use of any landing area or air navigation facility upon which federal funds have been expended. It was stipulated by the parties that federal funds had been expended on the airport at Shemya in the early 1950's. For this reason, no exclusive right of use in connection with the facilities at Shemya could be granted to defendant or to anyone else.

The lease of September 30, 1955, between the United States of America and Northwest declares it to be in the public interest that the facilities at Shemya be available to the aeronautical public on a non-discriminatory basis; required that the facilities be available to any civil or military aircraft of the United States or friendly foreign registry or ownership on a non-discriminatory basis; and required that Northwest furnish all available services at Shemya to the aeronautical public at fair and reasonable prices to be approved by the Administrator of CAA or his designee.

Paragraph J of the schedule of charges submitted by Northwest and approved by the Acting Administrator of CAA on July 12, 1957, provided in part that Shemya and its facilities should be listed in all publications as privately operated and available to the aeronautical public.

The court finds that on July 21, 1961, the facilities at Shemya were being operated by Northwest as a public airport within the purview of Air Transport Associates, Inc. v. United States, supra, and adopts as controlling the opinion in that case.

Defendant's efforts to distinguish this case from Air Transport on the ground that an approved tariff provision is involved in the present case is discussed later in this decision. Suffice it to say, at this point, that it is reasonable to conclude that the conditions of the use of Elmendorf Air Force Base airfield were not established unilaterally by those using the field but that the conditions imposed upon its use were those deemed proper by, and subject to, the approval of some officer or agency of the United States which, in reality, is all that was required in the present case.

It is Northwest's contention that regardless of the validity of paragraph 4 of the agreement of January 5, 1959, paragraph J of the schedule of charges which was approved by the Acting Administrator of the Civil Aeronautics Administration on July 12, 1957, which by reference was made a part thereof, is an approved tariff provision and is unquestionably valid and controlling in this case. This contention on the part of defendant is predicated upon Southwestern Sugar and Molasses Co., Inc. v. River Terminals Corp., 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959). Defendant's reliance on Southwestern Sugar presupposes that the schedule of charges here involved is a tariff filed with and subject to the pervasive regulatory authority of an expert administrative body and that the situation is effectively controlled by a pervasive regulatory scheme.

49 U.S.C.A. § 1159, section 10 of the International Aviation Facilities Act, supra p. 2, under which the lease between the United States of America and Northwest came into existence, authorizes the Director of the Civil Aeronautics Administration in connection with airport property and airway property in territories, including Alaska, to lease under such conditions as he may deem proper space or property for purposes essential or appropriate to their consolidation, operation, protection and administration and to make just and reasonable charges for aeronautical services. The lease of September 30, 1955, between the United States of America and Northwest required that Northwest, within 6 months from the date of the lease furnish the United States with a schedule of charges, to be approved by the Administrator of CAA, to be made by Northwest for such services at Shemya.

■■ Courts may take judicial notice of federal statutes and regulations prescribing the powers, duties, authority and jurisdiction of the Civil Aeronautics Administration and of the Administrator of that agency. From a review of the statutes and regulations on this subject in effect on July 12, 1957, the date on which the schedule of charges of which paragraph J forms a part, was approved by the Acting Administrator of the CAA, the court finds that the CAA and the Administrator of that agency were not on that date an expert administrative body with pervasive regulatory authority within the purview of the Supreme Court's decision in Southwestern Sugar Co. v. River Terminals, supra.

■ The facts of the present case bring it within the rule of Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), and the companion case of Boston Metals Co. v. The Winding Gulf, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933 (1955), as reiterated in Dixilyn Drilling Corp. v. Crescent Towing & Salvage Company, 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963). The rationale of these cases is that agreements of the type here involved relieving one from the consequences of his own negligence are unenforceable. The rule is grounded on public policy with the end in mind of discouraging negligence by making wrongdoers pay damages, and of protecting those in need of services from being overreached by others having power to drive hard bargains. On the authority of these cases the court finds paragraph 4 and paragraph J of the agreement of January 5, 1959, invalid.

Pursuant to court rule 12, counsel for Alaska is directed, within fifteen (15) days from date, to prepare, serve and submit proposed findings of fact, conclusions of law and judgment.