Henry SCATES, Appellant,

v.

ISTHMIAN LINES, INC., a corporation, et al., Appellee.

No. 17754.

United States Court of Appeals Ninth Circuit.

July 8, 1963.

Dorsey Redland and Van H. Pinney, San Francisco, Cal., for appellant.

McCutchen, Doyle, Brown & Enersen, Russell A. Mackey and Bryant K. Zimmerman, San Francisco, Cal., for appellee.

Before HAMLIN and DUNIWAY, Circuit Judges, and BOWEN, District Judge.

DUNIWAY, Circuit Judge.

Plaintiff appeals from a judgment entered upon the verdict of a jury in an action brought by him to recover damages for injuries that he claims to have sustained on board the SS STEEL ARCHITECT. The ship is owned by appellee, Isthmian Lines, Inc. It impleaded the United States (the charterer) and California Stevedore & Ballast Company, the latter being the stevedoring company

which was handling the loading of the ship.

At the commencement of the trial, the court ruled that evidence should first be offered in relation to the liability of Isthmian on the theory of unseaworthiness, and that a separate verdict would be rendered on that question. If the verdict were for Isthmian, this would also dispose of its claim against the impleaded defendants. So far as appears, there was no objection to this procedure and the case was tried in a manner consistent with the court's order.

Appellant makes four contentions:

1. That the court should have granted his motion for a new trial because the evidence shows substantially without contradiction that the accident occurred in the manner asserted by appellant and resulted from unseaworthiness of the ship.

2. That it was error for the court to permit counsel for the impleaded parties to participate at the trial and cross-examine witnesses.

3. That it was error to allow a witness to testify after he had sat in the courtroom in violation of an order excluding witnesses.

4. That the court erroneously refused to give certain proposed instructions.

We conclude that the judgment should be affirmed. We consider appellant's points in the order stated.

1. *The court did not err in denying a new trial.*

■ Appellant and his witnesses testified that while a gang of longshoremen, of which appellant was a member, were covering a hatch on the ship, one of the boards used for that purpose broke in two when appellant stepped on it, thus causing him injury. It was the theory of Isthmian that the accident did not occur. In this connection it was shown that Isthmian had no knowledge of the alleged accident until suit was filed more than eleven months after its claimed occurrence, that there was considerable improbability in appellant's story, and that there was considerable contradiction in the testimony of various of his witnesses. The testimony indicates that the hatch board in question was from 8 to 10 feet long, from 10 to 12 inches wide and about 3 inches thick. Each board was placed with its ends resting in grooves in the hatch coaming and the hatch beam and was supported in the middle by a "strongback." Appellant testified that the board broke about half way between the coaming and the strongback so that it was hanging down in two pieces between the strongback and the coaming. This means that under appellant's weight a board of these dimensions had broken in two places. It was Isthmian's position that this occurrence is so improbable that the jury did not have to believe appellant's witnesses. Appellant also testified that when the board broke under him his leg went through the resulting hole all the way to the crotch. There was testimony, however, that cargo in the hold below was stored to within a few inches of the hatch boards. This again, says Isthmian, indicates the improbability of appellant's story. The walking boss, called by Isthmian, testified that he did not hear about the claimed breaking of the board and that he had never heard of a hatch board breaking under a man's weight. The gang boss testified that the board did break, but that he had never had anything like this before. Moreover, he was impeached. In addition, appellant gave two versions of how the accident occurred, one in his deposition, and another at the trial. Isthmian persuaded the jury to accept its theory as to the facts and we cannot say that it was wrong.

■ Appellant's assertion that the trier of fact may not reject so-called uncontradicted testimony has long since been rejected by this court. (See Ramos v. Matson Nav. Co., 9 Cir., 1963, 316 F.2d 128, 132, and cases there cited.)

■ We do not doubt that it was within the discretion of the trial court to grant appellant's motion. It was also within its discretion to deny the motion, and this it did.

**2.** *It was not reversible error for the court to permit counsel for the impleaded parties to participate at the trial and cross-examine witnesses.*

The only issue submitted to the jury was that of the liability of Isthmian to appellant based upon the claimed unseaworthiness of the vessel. However, the United States and California Stevedore & Ballast Company were parties to the action and obviously had a direct interest in the question that the jury was to decide. At no time did appellant's counsel object to their participation at the trial or cross-examination of witnesses. In one instance an investigator for the government, an F.B.I. agent, was called. It is not clear whether he was called by Isthmian or by the government, but his direct examination was conducted by counsel for the government rather than by counsel for Isthmian. Appellant's counsel did not object. On motion for a new trial, the court concluded that there was no impropriety in the procedure followed and no prejudice to the appellant. Our review of the record indicates that these conclusions of the court are correct.

**3.** *It was not reversible error to allow testimony by a witness who had sat in the courtroom in violation of an order excluding witnesses.*

It is also claimed that the F.B.I. agent had been sitting in the courtroom while another witness was testifying, in violation of an order excluding witnesses which the court had made upon motion of the appellees. When appellant's counsel raised the question at the time the witness was called, the court asked counsel if he knew that the witness was present in the courtroom while appellant's witness Cabrel was testifying and counsel replied as follows:

> "We did. And perhaps we should have excluded him but we did not intend to call him as a witness at that time, unless Mr. Cabrel changed his story."

The court was of the opinion that there was no prejudice and permitted the witness to testify. The court had power to refuse to permit him to testify, but it also had power to permit him to testify, and there was no abuse of discretion in so doing. (See 6 Wigmore, Evidence § 1842 (3d ed. 1940))

**4.** *The court did not err in refusing to give the requested instructions.*

The requested instructions are set out in the margin.[1] The court did instruct the jury on the subject matter of these instructions and neither at that time nor in his briefs in this court does appellant contend that what the court

---

1. Instruction No. 6:
"If you find from all the evidence in this case that an unseaworthy condition existed by reason of a defective plank being used as a hatch cover, defendant ISTHMIAN LINES, INC., is liable therefor, regardless of by whom it was created."
Instruction No. 7:
"If you find from all of the evidence in this case that plaintiff HENRY SCATES fell and was injured as a proximate result of a defective hatch cover having been placed over the hatch in defendant's vessel, it is no defense to the charge of unseaworthiness that the defective condition of the hatch cover could have been observed by the stevedores at the time they put the hatch cover in place."
Instruction No. 8:
"I instruct you that the duty of the owners and operators of a vessel such as the SS STEEL ARCHITECT, involved in this case, to furnish the stevedore with a seaworthy vessel and a reasonably safe place to work is a non-delegable duty and that this duty, imposed by law, exists independent of and without any reference to negligence.
"In this regard I instruct you that 'unseaworthiness' means that a vessel, her gear, appliances and appurtenances and equipment are reasonably safe and sufficient for the purposes for which they are intended to be used. The duty imposed on the ship owner in this regard is an exacting one, a non-delegable one.
"Under the Maritime Law there is an absolute obligation to provide a seaworthy vessel and for failure to do so the owners of the vessel are liable for any injuries sustained by a stevedore which have been proximately caused by the breach of this obligation."

told the jury was erroneous. We also set out the court's instructions in the margin.[2] We think that the court's instructions adequately covered the matters included within appellant's requested Instructions Nos. 6, 7 and 8. The court had no duty to reiterate and re-emphasize these matters by giving the requested instructions in addition to those that it did give.

2. "On this subject I state to you that a ship owner, such as the defendant Isthmian Lines, is required by law to provide and maintain a seaworthy vessel for its crew and for other maritime workers customarily required to work aboard a ship—for example, longshoremen or stevedores, such as the plaintiff Scates in this case. I will now try to explain to you what is meant in the law by the term 'seaworthy vessel' or 'seaworthy ship.'

"A seaworthy ship is a ship whose hull, gear and equipment are reasonably adequate in design and state of repair and maintenance to perform their intended functions in the operation of the ship, and such that crew members or persons such as stevedores required to work aboard ship will have a reasonably safe place to work and not be subjected to unreasonable risk of harm by reason of failures or deficiencies in the ship, its hull, its gear, its appliances, its equipment, including, of course, such things as hatches and hatch covers.

"This requirement of seaworthiness does not go so far as to require perfection or the impossible; that is, it does not require that the shipowner provide and maintain the most effective ship equipment and appliances that the human mind can imagine or that the best scientific skill can provide. It does require, however, that the ship, its equipment and appliances including, of course, hatches and hatch covers, be reasonably suitable and safe, and whether a ship is so reasonably suitable and safe must be determined in the light of what was then reasonably possible, having in mind all the known facts as shown by the evidence, having in mind the best precautions in common, practical use in the shipping industry, having in mind the practical operation of a ship and having in mind the practices, experiences and the accumulated knowledge of the shipping business, and having in mind the necessities of the situation and all of the practical considerations involved.

Appellant also requested an instruction which listed a number of matters that the jury could consider in weighing the testimony of a witness. One of the matters was stated in the instruction as follows:

"Was the witness dealt with fairly by counsel, or was he, without fault of his own, confused or embarrassed

"This requirement of seaworthiness, you will note, does not go so far as to render the shipowner liable for every accident occurring aboard ship, but only for those accidents and injuries proximately resulting from an unseaworthy condition of the ship. If, however, a ship is unseaworthy within the meaning of that term as I have tried to explain it to you, then the shipowner would be liable to any member of its crew, and also to anyone such as the plaintiff, required to work aboard ship, who sustains injury as a proximate result thereof. And it would be immaterial whether the shipowner was or was not negligent in respect to such unseaworthy condition, and it would be immaterial whether the shipowner did or did not have knowledge or notice of such unseaworthy condition or opportunity to correct it before the accident.

"In other words, the liability of a shipowner under this doctrine of unseaworthiness depends not upon whether the shipowners did or did not exercise care to avoid the unseaworthy condition, but sole (sic) upon whether the ship was or was not, in fact, unseaworthy, within the meaning of that term as I have explained it to you. This duty of a shipowner to provide and maintain a seaworthy ship is a continuing duty of a shipowner and it cannot be avoided by delegating its performance to others.

" * * * if an unseaworthy condition of the ship proximately contributed to the accident and injury in whole or in part, then the shipowner becomes liable to the person injured even though the unseaworthiness of the ship was not the sole proximate (sic) of the accident and injury, as where, for example, the claimant himself may have also proximately contributed to his injury in equal or even greater degree, or as where the negligence of some third person—neither the shipowner nor the plaintiff here—may have also proximately contributed to the accident and injury."

and thus placed in a light not truly representative?"

It is the failure to give this part of the instruction about which complaint is now made. This complaint is based upon the fact that counsel for one of the impleaded parties, the stevedoring company, as well as counsel for Isthmian, cross-examined several of appellant's witnesses, including appellant himself. It would not have been error to give this portion of the proposed instruction. The court evidently felt, however, that there was no such unfair treatment by counsel, or confusion or embarrassment unfairly caused by counsel, as to make the instruction appropriate. Appellant's counsel points to nothing of this kind in the record other than the mere fact that more than one counsel on the defense side did cross-examine. We do not think that this fact alone is a sufficient basis upon which to conclude that the failure to give the instruction was in any way prejudicial.

Affirmed.